```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                        NORTHERN DIVISION

3

4   UNITED STATES OF AMERICA                        PLAINTIFF

5   VERSUS                  CRIMINAL NO. 3:03-cr-00068-HTW-LGI-1

6   CURTIS J. HARDY                                 DEFENDANT

7

8
                         MOTIONS PROCEEDINGS
9           BEFORE THE HONORABLE HENRY T. WINGATE,
             UNITED STATES DISTRICT COURT JUDGE,
10                     JANUARY 23, 2023,
                      JACKSON, MISSISSIPPI
11

12

13

14   APPEARANCES:

15   FOR THE PLAINTIFF:     KIMBERLY PURDIE, ESQ.

16   FOR THE DEFENDANT:     PRINCESS ABBY, ESQ.

17

18

19

20

21
     REPORTED BY:
22
         CAROLINE MORGAN, CCR #1957
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4188
25       E-mail:  Caroline_Morgan@mssd.uscourts.gov
```

# TABLE OF CONTENTS

Style and appearances...................................   1

Court Reporter's Certificate............................  53

| | |
|---|---|
| 1 | **IN OPEN COURT, JANUARY 23, 2023** |
| 2 | |
| 3 | THE COURT:  All right.  Good morning. |
| 4 | MS. ABBY:  Good morning, Your Honor. |
| 5 | MS. PURDIE:  Good morning, Your Honor. |
| 6 | THE COURT:  Terri, call the case, please. |
| 7 | COURTROOM DEPUTY:  Your Honor, this is the United |
| 8 | States versus Curtis Hardy, criminal action number |
| 9 | 3:03-cr-68.  Appearing by video is Mr. Hardy along with his |
| 10 | counsel, Princess Abby, and representing the Government is |
| 11 | AUSA Kimberly Purdie.  Before the Court is the continuation |
| 12 | of the compassionate release hearing. |
| 13 | THE COURT:  Okay.  Thank you. |
| 14 | Now, Ms. Abby, it's your motion.  So where were we last |
| 15 | time? |
| 16 | MS. ABBY:  Your Honor, I believe -- we were at the |
| 17 | point for the Government to make its argument, I believe, |
| 18 | and that's if I remember correctly.  Nevertheless, I have no |
| 19 | issue with rehashing our argument for the defense if the |
| 20 | Court would -- if the Court would like. |
| 21 | THE COURT:  Well, do you think you need to? |
| 22 | MS. ABBY:  I would prefer to, Your Honor, if that's |
| 23 | okay. |
| 24 | THE COURT:  Then I'll let you do so then. |
| 25 | MS. ABBY:  So this motion simply comes down to two |

1    things essentially, and that's whether or not the Court can

2    find that there were extraordinary and compelling

3    circumstances, and our argument is, of course, that there

4    are those circumstances.  They do exist.

5        And due to Mr. Hardy's age, race, medical conditions,

6    as well as COVID, of course, that's a huge factor within the

7    extraordinary and compelling circumstances, as well as all

8    of the issues that COVID brings especially for Mr. Hardy

9    considering where he is and considering his medical issues.

10       So since there are extraordinary and compelling

11   circumstances, the Court then goes to Section 3553(a)

12   factors, the sentencing factors.  And --

13       THE COURT:  Now, go back to the extraordinary

14   circumstances.  What are they?

15       MS. ABBY:  Yes, Your Honor.

16       THE COURT:  What are they?

17       MS. ABBY:  Well, the extraordinary circumstances would

18   be Mr. Hardy's -- his age, his race, and his medical

19   conditions and how all of those things play a huge factor in

20   COVID, and how it's -- and how with catching COVID that

21   could possibly lead to very, very dangerous circumstances

22   for Mr. Hardy.

23       THE COURT:  But how do I reach the standard of

24   extraordinary circumstances?  I mean, so these matters you

25   are giving me are generic, so how do those generic

1    circumstances amount to extraordinary circumstances?

2        MS. ABBY:  Specifically when dealing with Mr. Hardy,

3    that's what makes them extraordinary.

4        THE COURT:  Well, what's so extraordinary about it?

5        MS. ABBY:  So he suffers with -- and I believe the

6    medical -- the medical records has been submitted.  But

7    Mr. Hardy suffers with hypertension, diabetes,

8    hyperlipidemia, as well as some other unspecified issue in

9    his respiratory system.  What makes it extraordinary is

10   those medical issues combined with his age, combined with

11   COVID.  That's what makes it extraordinary.

12       THE COURT:  Well, let's take up each one.  So let's go

13   over the medical conditions.  Which one do you want to start

14   with first?  Because then I am going to ask you what is his

15   status on that particular medical condition.  So let's start

16   off with whichever one you want to, and then tell me then

17   what is his current situation.

18       MS. ABBY:  So I would -- well, before I start off with

19   the things I have listed, I want to start off with Mr. Hardy

20   has previously had COVID.  He is still suffering with

21   lingering effects with that.  Now --

22       THE COURT:  Okay.  And since we are on that subject,

23   how long ago did he have COVID?

24       MS. ABBY:  December 2020.

25       THE COURT:  And was he hospitalized because of that?

```
1        MS. ABBY:  He wasn't hospitalized.  He was placed in a
2   medical unit for 14 days, and I believe he stayed an
3   additional 7 days.
4        THE COURT:  So he was quarantined?
5        MS. ABBY:  Yes.
6        THE COURT:  So he was quarantined for 21 days?
7        MS. ABBY:  Yes.
8        THE COURT:  Okay.  And during that time period, what
9   extraordinary suffering did he have during that time period?
10       MS. ABBY:  I would assume all of the things that come
11  with COVID.  But --
12       THE COURT:  I don't want to assume.  I don't want to
13  assume, though.  So just tell me then when he was
14  quarantined, did he have to have some special medical
15  attention, or was he just simply placed in isolation?
16       MS. ABBY:  I know -- I know that he had -- he had
17  issues with his breathing at that time, but as for any
18  specific details, Mr. Hardy would have to speak at that.
19       THE COURT:  And during this 14 days, what kind of
20  medical treatment did he receive?
21       MS. ABBY:  I know he received medicine and some medical
22  treatment from the medical unit at the -- at the prison, but
23  I don't believe I can -- or if the Court gives me a moment,
24  I can try to find a name of the medicine, but I know he
25  received medicine in medical treatment.  And I do believe
```

1    it's within the medical records that we submitted.  What I

2    am looking at now is the current medicines he takes for his

3    illnesses.

4         Your Honor, I'm not sure the name of the medicines that

5    he took.  Nevertheless, they treated him for his COVID

6    symptoms.

7         THE COURT:  Was this regular treatment, or is there

8    something about the treatment that awakened any fears of --

9    that his life was in danger?

10        MS. ABBY:  Mr. Hardy has expressed that he doesn't have

11   a very strong -- what's the word I'm looking for -- trust

12   within the medical system itself due to things of the past

13   with maybe his bloodline or things that his people informed

14   him about the passing of syphilis to black men, so I know --

15        THE COURT:  Now, hold up.  Is he talking about -- what

16   is he talking about?  The passing of -- you're not talking

17   about the Tuskegee Experiment, are you?

18        MS. ABBY:  Yes.  Yes.

19        THE COURT:  That was back in the 40's.

20        MS. ABBY:  Right.  And so I know that that has caused

21   Mr. Hardy's distrust within, like, the medical system, so I

22   want to say that very well puts him at fear right there

23   between his age him, him knowing that information and

24   knowing that that happened to black men, and him

25   experiencing COVID and people dying from COVID.  So, yeah,

1    it makes a lot of sense that he would be afraid for his

2    life.

3         THE COURT:  Well, now, he himself was not apart of his

4    experiment.

5         MS. ABBY:  No.  I believe what he explained to the

6    Court last time is that maybe someone -- some family member

7    far off or someone that his family member knew, but it was

8    close to him in the past some kind of way.

9         THE COURT:  I don't quite understand that.  I mean, is

10   he asserting that that type of conspiratorial conduct on the

11   part of the Government has continued?

12        MS. ABBY:  Honestly, Your Honor, I think we are not

13   sure.  We didn't --

14        THE COURT:  I'm talking about what's -- it was found

15   out a long time ago.  This is not a recent development.

16        MS. ABBY:  Not recent as to now, but I'm talking about

17   later from when it was happening, so if it is happening

18   currently, we wouldn't find out until later.

19        THE COURT:  Okay.  But so what is he saying now that he

20   fears as a conspiracy?

21        MS. ABBY:  So what I am saying that he is saying is

22   that because of that, that's the huge reason why, you know,

23   he didn't get the vaccine.  And so that, COVID, his age,

24   seeing other people catch it, seeing people die from it, a

25   huge amount of people dying from it, that placed him at fear

1   for his life.

2       THE COURT:  Okay.  And then let's continue with the

3   other extraordinary ailments that he has.  What are they?

4       MS. ABBY:  One would be hypertension, and there's been

5   various, various courts to agree that hypertension in and of

6   itself would warrant release -- compassionate release.

7   There are different courts that, you know, repeatedly

8   recognized that COVID-19 presents a heightened risk for

9   individuals with hypertension, and that is something that

10  Mr. Hardy suffers with.

11      THE COURT:  Okay.  What does your client know about the

12  Tuskegee Experiment?  You say he has this fear, so how much

13  does he know about it?

14      MS. ABBY:  Well, I found out that he knew about it when

15  he was explaining to the Court at the last hearing.

16      THE COURT:  You didn't know about it?

17      MS. ABBY:  Sir?

18      THE COURT:  You are saying you did not know about it

19  before that?

20      MS. ABBY:  I knew about it.  I found out that he knew

21  about it, and that was the basis for his fear.

22      THE COURT:  Okay.

23      MS. ABBY:  Or one of the basis for his fear.

24      THE COURT:  So then you want to relate to me what he

25  thinks he knows about it?

1      MS. ABBY:  I'm not sure what all he thinks he knows

2      about it, other than it happened to black men here, it was a

3      secret, just like the basis.  If he knows anything in

4      detail, I wouldn't be -- I wouldn't know.

5      THE COURT:  Okay.  Well, then, what do you know about

6      it in detail?

7      MS. ABBY:  I know the basis.  I know it happened a long

8      time ago.  I know that they were basically lying to young --

9      young black men, telling them that some type of vaccine or

10     medicine or something -- and instead they were injecting

11     them with syphilis using them as guinea pigs to see how

12     syphilis effects the body instead of actually treating them,

13     and it went on for a very long time.  Instead of getting

14     better, people got worse.

15     THE COURT:  And do you know what the consequences of

16     syphilis are when it goes untreated?

17     MS. ABBY:  I think you can go blind.  I know, like,

18     skin complications.  I think it can affect, like, some

19     internal organs, but as far as specifics, I'm not sure.  And

20     I think I only know that a person can go blind, because Your

21     Honor stated that the last time we discussed this.

22     THE COURT:  Okay.  Anything else on this fear of

23     Government's diversion or conspiratorial conduct that has

24     caused him to be apprehensive of any Government-sponsored

25     medicinal plan?  Are you saying that he is afraid anything

1    that is sponsored by the Government?

2         MS. ABBY:  I wouldn't put it as broad as anything, but

3    just some apprehensiveness especially when it comes to,

4    like, accepting the vaccine.

5         THE COURT:  Has your client had a polio shot?

6         MS. ABBY:  I'm not sure.

7         THE COURT:  Okay.  Well, go ahead and make your

8    argument.  I'm with you.  Continue.

9         MS. ABBY:  Okay.  So essentially his medical -- all of

10   his medical conditions, his age, and everything that is

11   happening with COVID, and his placement, how he is not

12   really -- he is not in a place where he can essentially

13   social distance from people to keep himself safe, all of

14   those things combined together, nothing alone.  But all of

15   these things together equal extraordinary circumstances, and

16   because that equals extraordinary circumstances, that's what

17   takes us to the sentence factors.

18        Now, the Supreme Court has ruled that the Court may

19   consider rehabilitation since his original sentencing,

20   that's in *Concepcion* and in *Pepper versus the United States*.

21   So when looking at those factors, we would argue that

22   Mr. Hardy is warranted for release.  He spent ample amount

23   of time in prison, over 17 years in prison.  He is -- he has

24   been essentially almost a model prisoner, no disciplinary

25   records.  He has received his certificate, and he is a

1   certified paralegal.  Of course we spoke a lot about the

2   Heroism Award that he received.  He has a zero or a negative

3   one for recidivism, and that's according to the BOP.  So

4   when looking at all of these things, Mr. Hardy definitely

5   should be granted compassionate release.

6        Now, throughout this entire time, it seems as though

7   the Government's argument has essentially been Mr. Hardy

8   still poses still sort of danger or danger to the community.

9   That doesn't prohibit compassionate release especially since

10  the guideline Section 1B1.13 is what required that, and

11  that's not binding, and we know that, because we are back

12  here.  That's why the case was remanded in the first place.

13       So not only does their argument fail because a danger

14  to the community doesn't prohibit compassionate release,

15  Mr. Hardy simply isn't a danger.  As I stated -- for the

16  same reason I stated, the BOP itself considers him not to be

17  a danger.  It's been years.  He has a -- he has a strong

18  family support system and a strong plan, release plan to be

19  with his family and to be able to actually social distance

20  and to have his son help him with things like getting food

21  or getting his medicine, so Mr. Hardy can stay safe.

22       He's -- because of these things and because he should

23  be released to be at home or at least placed on some type of

24  home confinement, he is not going to be a danger to the

25  community, because he has no plans of being out in the

1   community essentially.

2       Now, of course to say not at all would be a stretch,

3   but for the most part, Mr. Hardy is looking to be safe.  He

4   is worried about his health and his life, and he is wanting

5   to be safe.  And so that's why we believe that he should be

6   granted compassionate release.

7       THE COURT:  All right.  I saw Mr. Hardy raise his hand

8   a few moments ago as though he wanted to say something.  Do

9   you have a problem with his saying anything?

10      MS. ABBY:  No, Your Honor.

11      THE COURT:  Mr. Hardy, I saw your hand.  Is there

12  something you want to add?

13      THE DEFENDANT:  Basically what I wanted to say to the

14  Court, Your Honor, at the conclusion of our last hearing, it

15  was my understanding that the Government has pretty much

16  closed their case.  When she stated to the Court that the --

17  a request to deny the motion.  And I felt as though the

18  Court should have concluded and allowed the rebuttal to

19  begin.

20      And I have talked with my attorney, and I was hoping

21  that we would be able to present the rebuttal today, and

22  because this case has been going on since approximately one

23  year, and the remand was given out on February 9th of last

24  year, 2022.  So it was my hope that we would -- the Court

25  would allow the rebuttal and allow the Court to conclude

1    whatever the Court deem appropriate for this particular

2    case.

3         Additionally, I wanted to ask my attorney to allow me

4    to present the rebuttal to the Court.  She --

5         THE COURT:  Well, I said if you have something to say,

6    you can go ahead and say it.  She said she has no objection

7    to it.

8         THE DEFENDANT:  Okay.  Okay.  Well, what I would like

9    to --

10        THE COURT:  And she still is shaking her head saying

11   she has no objection, so if you have something you want to

12   say, you can go ahead and say it.

13        THE DEFENDANT:  All right.  Okay, Judge.  Thank you.

14        As the Court is aware, the defendant motion was

15   submitted pursuant to the First Step Act of 2018.  The very

16   title of the First Step Act of amendment to 3582 makes plain

17   what Congress was trying to do or accomplish, and that is

18   increasing the use and transparency of compassionate release

19   for federal prisons.

20        The First Step Act eliminated the BOP at the gate

21   keeper by giving prisons the right to petition the Court

22   directly and further required the BOP within one year of the

23   act passing to submit a detailed report to Congress on the

24   use of compassionate release.  Yet another indication that

25   Congress intended that more individuals received

1    compassionate release that briefs Senator Cory Booker,

2    Senator Cardin, Senator Durbin, and Senator Grassley

3    allowing the passing of the First Step Act as expanding

4    compassionate release and expediting compassionate release

5    application.

6         Just to reiterate, Your Honor, much of what has been

7    presented to this Honorable Court throughout both hearings,

8    the defense disagrees with the Government assertion of

9    events as the Government's assertion are without any federal

10   reason, explanation, or case authority.

11        In a recent ruling by the Supreme Court in *Concepcion,*

12   *Your Honor, versus United States*, that was a June 27th,

13   2022, ruling, Your Honor.  The Supreme Court held that when

14   a district court adjudicates a motion for compassionate

15   release under the First Step Act, the district court may

16   consider any other intervening changing of the law or

17   changes of the facts, such as behavior in prison in

18   determining whether and to what extent to reduce inevitable

19   Defendant's sentence.

20        First, contrary to the Government's assertion that the

21   defendant does not meet the extraordinary and compelling

22   analysis for compassionate release and further assertions of

23   the Government that the 3553(a) factors does not warrant

24   release.

25        Okay.  To begin with, the Government's first assertion,

1    extraordinary and compelling analysis.  This Court may

2    reduce a sentence if extraordinary and compelling reasons

3    warrant such a reduction and such a reduction is consistent

4    with applicable policy statement issued by the Sentencing

5    Commission.  The United States in *United States versus*

6    *Shkambi,* that would be 993 F.3d 283 as an April 2021 case.

7    The Fifth Circuit Court of Appeals held that as of now there

8    is no Sentencing Commission policy statement applicable to a

9    defendant to file a motion.

10       Therefore, this Court need not conform to the

11   3582(c)(1)(A) consistency requirement to 1B1.13 in

12   determining whether there exist an extraordinary and

13   compelling reason for a sentence reduction.  In other words,

14   it is for this Court alone to determine whether that exist

15   in extraordinary and compelling reason for a reduction in

16   sentence in the instant case.

17       Under the extraordinary and compelling analysis and

18   similar to Defendant case in *United States versus Barbieri*,

19   that would be 845 Fed. Appendix 911, a 2021 case, the Fifth

20   Circuit Court of Appeals vacated and remanded holding that

21   Mr. Barbieri medical condition constitutes extraordinary and

22   compelling reasons for release, concluding that diabetes,

23   hypertension, and coronary heart disease are serious medical

24   conditions, which according to CDC, put Mr. Barbieri at an

25   increased risk of severe COVID-19 infection.

1          In the instant case, the defendant's medical records

2     reflect that he, too, suffers with type-two diabetes,

3     hypertension, hyperlipidemia, esophageal reflux, and

4     neoplasm of an unspecified behavior of the respiratory

5     system.  These medical conditions of the defendant also meet

6     the Court of Appeals and as well as the CDC guidance

7     constituting extraordinary and compelling reasons for

8     release, additionally putting Mr. Hardy at increased risk of

9     severe COVID-19 infection.  Nonetheless, it meets the

10    extraordinary and compelling circumstances.

11         The defendant would also like to show this Honorable

12    Court that in addition to the risk posed by COVID-19, there

13    are numerous other reasons in the instant case weigh in

14    favor of extraordinary and compelling reason for release.

15         For example, the defendant term of imprisonment has

16    been made harsh by the COVID-19 pandemic.  Numerous courts

17    have recognized that the pandemic has made incarceration

18    harsher and more punitive that would otherwise have been.

19         In addition to harsh conditions, the defendant already

20    have experienced -- prior to the pandemic, the defendant has

21    endured for the last two and a half years extended lockdown

22    where he was confined to his cell for 24 hours a day and

23    limited to a five-minute shower every three days.  He has

24    not seen his family in over 29 months due to visitor

25    restriction.  While harsh condition and the risk of

1    contracting COVID-19 are insufficient on their own, these

2    factors weigh in his favor of finding extraordinary and

3    compelling reasons, in addition, violates the 8th Amendment,

4    cruel and unusual punishment.

5        Secondly, as stated in Defendant's previous memorandum,

6    support -- in support of his motion for compassionate

7    release, this memorandum, Your Honor, was dated August 8th,

8    2022, submitted by Counsel Abby where she notified the Court

9    that Defendant is currently seeking medical attention as a

10   result of suffering lingering effects of COVID-19.

11   Defendant medical records reflect that the defendant

12   continue to suffer since testing positive for COVID-19.

13   Particularly, he suffers from the after effect, which

14   include constant drainage of his nose, heavy breathing, and

15   constant chest pain.  This is in addition to the other

16   various illness he has making the defendant more susceptible

17   to the virus.

18       Again, Your Honor, contrary to the Government's first

19   assertion and based on the above mention, it is clear that

20   extraordinary and compelling circumstances exist in the

21   instant case according to the Fifth Circuit Court of

22   Appeals.

23       Now, secondly, I would like to move to the 3553(a)

24   factors, Your Honor, in response to the Government's second

25   assertion that the 3553(a) factor does not warrant relief.

1    The defendant, Mr. Hardy, released following approximately

2    two decades of imprisonment satisfies the goal of the

3    sentence and factors stated in 3553(a).

4        Section 3553(a) provides that a sentence should be

5    sufficient, but not greater than necessary, see *United*

6    *States versus Sawyer* (phonetically), that would be

7    (unintelligible) 8928.  That's an April 1st, 2022 rule.

8    Contrary to the Government's assertion, I would now give the

9    Court an examination of the 3553 factors.

10       The first several factors under 3553 requires

11   consideration of the nature and circumstances of the offense

12   along with Defendant's history and characteristics.  Both

13   parties here agree that the defendant's offense was a

14   serious crime and that there were no injuries at all

15   involved in the instant case.  It is also undisputed that

16   Defendant's conduct and rehabilitation since the offense

17   have been exemplary as described throughout all documents

18   submitted to this Honorable Court.

19       Again, as observed in *Pepper versus United States*, that

20   would be 562 U.S. 476, a 2011 ruling, stating the Defendant

21   history and characteristic did not freeze on the day of his

22   arrest.  I repeat, the defendant's history and

23   characteristics did not freeze on the date of his arrest.

24   Evidence of post-sentencing rehabilitation may be highly

25   relevant to several 3553(a) factors.  In the instant case,

1    the defendant present date characteristics and

2    post-sentencing history weighs heavily in favor of release.

3    Today, the defendant's institutional record will reflect

4    that Defendant is not the same person who appeared before

5    this Honorable Court for sentencing two decades ago.  As of

6    April 2nd, 2023, the defendant will be 59 and regrets his

7    past and is committed to living a law-abiding life.

8        Defendant remorse and rehabilitation are best

9    demonstrated by his exemplary institutional record over the

10   last two decades in the Bureau of Prison.  With the approval

11   of the warden of this institution, the defendant works as an

12   A and O clerk where he work with all newly arrived inmates

13   to assist them in cleanly navigating their way through the

14   BOP institution setting demonstrating genuine interest and

15   intent to abide by all rules and requirements.

16       Additionally, Defendant institution progress report

17   will reflect that Defendant adjustment in prison has been

18   that of a model prisoner over the last two decades.

19       During Defendant's incarceration, Defendant has

20   received over 25 certificates of completion in vocational

21   and educational program to include, but not limited to, real

22   estate, legal research, tutor training, parenting, anger

23   management, drug program, health and fitness, as well as

24   course of other programs.  In continuing his educational

25   rehabilitation efforts and as an important goal for himself,

1    Defendant is now a graduate of Blackstone Career Institute

2    where he received, with distinction, his certificate to

3    become a certified legal assistant paralegal where Defendant

4    plans upon his release to also endeavor into that field.

5        Over the period of his incarceration, the defendant has

6    also held numerous work details, maintained good work

7    performance evaluation, as his committed to self-improvement

8    is reflected in the BOP progress reports, which highlights

9    his positive effort with executives there and supervisors

10   supporting a commitment to personal growth.

11       Defendant -- additionally, Defendant -- for his quick

12   response, Defendant Hardy received the Heroism Act Award for

13   saving the life of Lieutenant Kanem (phonetically).  The

14   second part of the 3553(a) factors recognizes the need for

15   the sentence imposed to reflect the seriousness of the

16   offense, to promote respect for the law, and to provide just

17   punishment for the offense.  As discussed throughout this

18   hearing, Defendant, almost two decades in prison, has

19   already served all of the above (unintelligible),

20   particularly in comparison to sentence of other convicted of

21   similar crimes.

22       The third part of 3553(a) recognizes the need for

23   sentence imposed to protect the public from further crimes

24   of the defendant.

25       In the instant case, it is undisputed that the

1   defendant has not engaged in a single act of violence since

2   he was incarcerated.  In fact, the Bureau of Prisons

3   qualifies Defendant general violent risk level as a low and

4   reports that Defendant does not have a past for violent

5   offenses.

6       Also, executive staff, Joshua Newcomer, submitted a

7   character letter on behalf of Defendant describing the

8   defendant as a productive and compassionate inmate who is

9   committed to personal growth and serving his community.

10  Most importantly, in support by the United States Sentencing

11  Commission report on the effect of aging on recidivism among

12  federal prison.  Based on Defendant's age, spotless

13  disciplinary record over the last two decades,

14  rehabilitation efforts, low recidivism level, and strong

15  family ties, all suggest that Defendant is unlikely to

16  recidivate.

17      In a recent ruling out of the Southern District of

18  Mississippi, in *United States versus Spiker* (phonetically),

19  that would be, Your Honor, U.S. District (unintelligible)

20  201689.  This is a recent 2022 case.  The Honorable Judge

21  Tom Lee also held in *Spiker* that older defendants are less

22  likely than younger defendants to recidivate following the

23  release.

24      Moving on to the fourth subpart of 3553(a) addresses

25  the need for the sentence to provide the defendant with

1    needed education or vocational training in the most

2    effective manner.  The sentence served has already

3    accomplished this end.  The BOP progress report, Your Honor,

4    shows that Defendant has taken full advantage of the

5    educational and vocational opportunity offered in the Bureau

6    of Prisons, including Defendant's certification as a legal

7    assistant paralegal.

8         Finally, reducing Defendant sentence will achieve the

9    aim of the fifth subpart of 3553(a), the need to avoid

10   unwarranted sentencing disparity among defendant with

11   similar offenses.  Defendant has already served a sentence

12   that is longer than the average time for murder or

13   manslaughter.  The United States Sentencing Commission 2002

14   source book of the federal sentencing certificate states

15   that the average federal sentence for murder in physical

16   year of 2003 was 232 months or slightly over 19 years.

17        Again, contrary to the Government's assertion, this

18   Court should find that a sentence reduction is consistent

19   with the sentencing factors set forth in 3553(a).  As

20   submitted to this Court, Defendant has maintained a strong

21   relationship with his family and has developed a detailed

22   release plan.  Upon his release, Defendant plans to live

23   with his daughter, Sierra Rogers (phonetically), whose

24   resident is located in Canton, Mississippi.

25        Additionally, the defendant has secured employment at

1    Bob Boyte Honda in Pearl, Mississippi.  Mr. Darren Kelly

2    (phonetically) manager, can verify Defendant's employment

3    and can be contacted at 601-502-6580.

4         In closing, Your Honor, Defendant argues that a

5    reduction of Defendant's sentence would not diminish the

6    seriousness of the offense, nor would it place the public in

7    any danger.  The extraordinary and compelling circumstances

8    presented by the defendant significant health condition that

9    put him at risk of serious illness from COVID-19

10   reinfection, the lengthy period of incarceration he has

11   already served, his post-offense rehabilitation, the

12   disparity created by unduly harsh sentence, and Defendant's

13   low recidivism level, warrants release.

14        Defendant respectfully ask this Honorable Court to

15   allow his outstanding institutional record to be a testament

16   to remorseful upstanding man he has become, as well as a

17   strong predictor of how he would perform on supervised

18   release and beyond.

19        More importantly, the defendant respectfully ask this

20   Honorable Court to evaluate him not as he was on the day of

21   sentencing, but as he stands before the Court today.  I

22   thank you, Your Honor.

23        THE COURT:  And what was the crime of conviction?

24        THE DEFENDANT:  It was a bank robbery.

25        THE COURT:  And what was the sentence?

1          THE DEFENDANT:  The Court sentenced me to 384 months.

2     I think would have amounted to about 32 years, somewhere in

3     that range.

4          THE COURT:  And the criminal history score was what?

5          THE DEFENDANT:  I think it was a VI, Your Honor.

6          THE COURT:  And you also mentioned the unduly harsh

7     sentence?

8          THE DEFENDANT:  Yes, sir, Your Honor.

9          THE COURT:  What was unduly harsh about your sentence?

10         THE DEFENDANT:  Well, in reference to especially the

11    last two years, in most cases, if any honorable judge would

12    know that the condition that we had to go through -- for

13    example, I have been locked down for the last two years,

14    like, for 24 hours a day.  Pretty much we would come out for

15    -- to eat, or some days we would come out to do your shower.

16         And not only that, they basically just cut me off from

17    my visitors.  I couldn't get my family here to see me, or it

18    was just -- it just been a terrible ordeal.  The food has

19    been, I mean, ridiculous.  Sometimes they just give us

20    something because they don't have something.  It has been a

21    very horrible idea, Your Honor.  Along with COVID

22    experience, it's just been drastic, and there are several

23    courts that put that under consideration.  Not saying that

24    that was sufficient on its own to be considered reason for

25    compassionate release, but we are saying that combined with

1    other circumstances that the defendant had to deal with.

2        THE COURT:  So you are not saying that the initial

3    sentence was unduly harsh?

4        THE DEFENDANT:  No, sir.  No, sir.  No, sir.  Not

5    saying that initial sentence, you know, was unduly harsh at

6    all, because the Court utilized the applicable -- the law at

7    the time of the sentencing.  Of course I don't agree that,

8    you know, that I should have got that sentence, but that's

9    what the law calls for, and I understand that the Court has

10   to follow the law.

11       THE COURT:  And on this bank robbery, did you have a

12   weapon?

13       THE DEFENDANT:  Yes, sir.

14       THE COURT:  And what kind of weapon did you have?

15       THE DEFENDANT:  It was a fake -- toy weapon pretty

16   much.  It wasn't no ammunition in the weapon or anything,

17   and it's in the report.

18       THE COURT:  Was that weapon, if it was a weapon, ever

19   recovered by the authorities?

20       THE DEFENDANT:  Yes, sir.

21       THE COURT:  Were you arrested at the scene?

22       THE DEFENDANT:  Yes, sir -- well, not at the scene.

23   They came to my house.

24       THE COURT:  And at your house, did they recover what

25   appeared to be a gun?

1        THE DEFENDANT:  Yes, sir.

2        THE COURT:  Is that in evidence?

3        THE DEFENDANT:  Yes, sir, I think it is.

4        THE COURT:  Okay.  Now, thank you.  Let me go now to

5    the prosecution.

6        MS. PURDIE:  Good morning, Your Honor.

7        THE COURT:  Good morning.  Okay.  Your response if you

8    have one?

9        MS. PURDIE:  Well, Your Honor, while it is fresh on my

10   mind, according to the PCR (sic) -- or the PSR, I

11   apologize -- the gun was a semi-automatic 25-caliber

12   handgun, so it was not a toy weapon that was used.  It was a

13   -- I don't know whether or not it was loaded, but it wasn't

14   a toy, and it was pointed teller's head during the course of

15   the robbery.

16       THE COURT:  How many people participated in the

17   robbery?

18       MS. PURDIE:  I believe it was just the defendant, Your

19   Honor.  I don't believe he had a codefendant according to

20   the PSR.

21       THE COURT:  Was the gun loaded?

22       MS. PURDIE:  It does not say in the PSR whether the gun

23   was loaded, Your Honor.

24       THE COURT:  What about in a section on forfeiture?  Did

25   the Government seek to forfeit the weapon and any

 1    ammunition?

 2         MS. PURDIE:  Let's see, Your Honor -- Your Honor, due

 3    to the age of the case, I'm not able to pull that up on ECF.

 4    I'm not sure if the original indictment is available in this

 5    file.

 6         THE COURT:  Well, does the indictment contain a

 7    forfeiture provision?

 8         MS. PURDIE:  I'm trying to locate a copy of the

 9    indictment, Your Honor.

10         THE COURT:  Okay.

11         MS. PURDIE:  Let's see -- here it is.  That's not it.

12         (Discussion off the record.)

13         MS. PURDIE:  Your Honor, I am sure it is available

14    somewhere in this file, but it is so much.

15         THE COURT:  Okay.  I'll go back through my file.  I

16    didn't bring it into the courtroom.

17         MS. PURDIE:  And I can't access the indictment on ECF

18    due to the age of the case.  So...

19         THE COURT:  I'll have all of that in my file.

20         MS. PURDIE:  Okay.  I apologize.

21         THE COURT:  It's okay.

22         Mr. Hardy, the prosecutor qualms with your statement

23    that that was toy gun.  Are you still contending it was a

24    toy gun?

25         THE DEFENDANT:  Say it again, Your Honor.

1        THE COURT:  Are you -- I said that the prosecutor

2   disagrees with your statement that at that time of the

3   robbery you had a toy gun.  So --

4        THE DEFENDANT:  Your Honor --

5        THE COURT:  -- are you still saying you had a toy gun

6   and not a real gun?

7        THE DEFENDANT:  Your Honor, let me reiterate that a

8   little bit, please, sir.  My reference to a toy gun was

9   because the gun could not shoot.  It could not shoot, and it

10  had no -- no ammunition in the gun.  You couldn't even

11  really pull the trigger on the gun.  That was -- that was

12  why I was referring to it, because it was no way that the

13  gun could fire at all.

14       THE COURT:  Now, there's a difference between a toy gun

15  and a gun that is inoperable.  So which one are you saying

16  here?

17       THE DEFENDANT:  Well, I apologize.  I apologize.  Let's

18  turn that to a gun that was inoperable.  I apologize.  I

19  used the basic street terminology in describing that, and I

20  apologize and --

21       THE COURT:  Why are you saying that it was inoperable?

22       THE DEFENDANT:  Because it had been kept around at the

23  residence for quite a while, and my uncle and a couple other

24  people has tried to use it -- tried to use it for --

25  exactly, I think, one -- New Years Day, they tried to use

1   it, and it wouldn't do anything.  And actually, he just left

2   it there.  And --

3           THE COURT:  So then what made the gun inoperable?

4           THE DEFENDANT:  Well, what I do -- I don't really know

5   that much about guns, but what I do know about that

6   particular gun, Your Honor, was that it could not fire.

7   That's all I knew about it.

8           THE COURT:  Were there bullets in the chamber?

9           THE DEFENDANT:  No, sir.

10          THE COURT:  Did the Government recover any bullets?

11          THE DEFENDANT:  Not that I know of, Your Honor.  They

12   shouldn't of, because I don't think there were any there.

13   They took the gun out of the drawer where it was kept at,

14   and I don't think -- in recalling back, it couldn't have

15   been no bullets in there, because we know -- everybody in

16   the house knew it couldn't fire.

17          THE COURT:  But you are saying that's the gun you

18   carried to the bank?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  And I'll look back at the PSR on these

21   matters.  But what was the name of the bank?

22          THE DEFENDANT:  Sir?

23          THE COURT:  What was the name of the bank?

24          THE DEFENDANT:  I don't even know.

25          MS. ABBY:  Your Honor, if I may, it was Union Planters

1    Bank.

2        THE COURT:  Union Planters?

3        MS. ABBY:  Yes.

4        THE COURT:  All right.  And counsel, do you agree with

5    your client that this gun was inoperable?

6        MS. ABBY:  I have no information on that.  Of course, I

7    wasn't representing him at that time, and the PSR that I'm

8    looking at it, it has no information about whether or not

9    the gun was operable or not.  But it also lacks information

10    about any ammunition.

11        THE COURT:  Mr. Hardy, was the bank protected by an

12    armed guard?

13        THE DEFENDANT:  Can you repeat that, Your Honor?

14        THE COURT:  Was the bank at the time of the robbery

15    protected by an armed guard?

16        THE DEFENDANT:  I would have to say no, Your Honor.

17    Because I never -- it was no information that came up on

18    that particular issue.  None was in my PSI (sic).  None was

19    in my progress report.

20        THE COURT:  I don't quite understand your answer.  You

21    were at the bank.

22        THE DEFENDANT:  What I am saying is that there was no

23    security guard at the bank.  If that answer your question.

24        THE COURT:  Well, if you are saying that you didn't see

25    one -- are you saying you did not see a security guard?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Are you saying that you knew for a fact

3    that the bank was not guarded by a security guard?

4          THE DEFENDANT:  No, sir, I am not saying that.  What I

5    am saying is, in reading the reports of the investigating

6    officers, there was no information that I can recall about a

7    security guard.  And reading my discovery packets, there was

8    no information that I can recall that mentioned about a

9    security guard.  And --

10         THE COURT:  I ask this question especially on cases of

11   robbery of institutions where the victim institution might

12   have been guarded by a security -- armed security guard, and

13   the question that I ask and have asked and especially ask

14   when I prosecuted on these matters, is whether the defendant

15   upon entering the bank with what appeared to be an

16   inoperable firearm -- or for that matter, where the robber

17   entered a bank knowing that the bank was protected by an

18   armed guard, whether the robber was prepared to commit

19   suicide.

20         In a sense that when robbers enter into a bank

21   protected by an armed guard, they certainly recognize the

22   possibility that the armed guard is going to observe them

23   with what appears to be a usable firearm, and the security

24   guard might open fire.  I ask the same question when a

25   defendant says that he entered a bank with an inoperable gun

1    that the any observer would appear to be an operable gun and

2    where that bank robber would be taking a chance that the

3    armed guard would open fire.

4         In a number of instances where I have broached this

5    subject at the prisons that I have visited, and where I have

6    talked to robbers who went into a bank with a weapon, I have

7    asked whether the gun was operable or inoperable.

8         And first of all, in the instances where the gun was

9    operable, I ask the bank robbers did they intend -- upon

10   their request for money at the bank, intend to commit

11   suicide, because if the guard pulled out his weapon and

12   started firing, then the bank robber could get killed.  And

13   so I ask them what do they intend to do especially when they

14   had a gun that was operable.  The answers I have gotten on

15   many occasion is that the bank robber said they would have

16   shot back, because they did not intend to commit suicide,

17   that is they didn't intend to walk into a hail of gun fire.

18   They wanted to live.  So then I said, so then you were to

19   prepared to kill the guard, and the answer was yes.  And I

20   asked them to justify that.  Several -- well, more than

21   several, a number said that if they killed the guard, it was

22   not their fault.  And I asked why not, because they were the

23   ones in the bank trying to rob the place, and the guard had

24   a duty to protect it.

25        The prisoners in this vein responded that the guard

1    would be responsible for his own injury if he suffered

2    injury or death, because as they put it, they already had

3    their guns out, and the guards should not have sought to

4    pull his gun.  And I says, but he had a duty, so what was

5    wrong with him trying to protect the bank and his assets?

6    And their response was, he shouldn't have of, because they

7    had their guns out, and if he pulled his gun out while they

8    had their guns out, then any injury to him was his own fault

9    and not theirs.

10       I have unfortunately heard that a number of times,

11   because I have visited a number of penitentiaries, and I

12   have asked this to a number of so-called bank robbers who

13   have gone into a bank with either a real gun or a supposedly

14   inoperable gun, and the answers have always been troubling.

15       So in your case, what you are telling me is that you

16   went into a bank, and seemingly what you're saying is that

17   you had not scouted the bank beforehand, and thus, you

18   weren't completely sure that the bank was not protected by

19   an armed guard.  But nevertheless, you went into a bank with

20   a weapon that looked genuine, and I ask then were you

21   prepared to die, because if so, if an armed guard was there

22   and pulled his weapon, then you are telling me that you were

23   prepared to die if a guard then pulled his weapon on you.

24   That would defeat the purpose of robbing the bank and making

25   an escape.

1          And so I'm troubled when I hear that someone went into

2     a bank with a notion of robbing the bank with an inoperable

3     gun or even a realistically looking toy gun.  That's why I

4     asked the question.  But I'll look back through my materials

5     on this case and see if there is any question about whether

6     the gun was loaded, unloaded, et cetera, but I am concerned

7     that you described it as a toy gun.  And I would like to

8     know why the gun was inoperable.  You said it wouldn't fire.

9          Well, I'll look through the records and see if the gun

10     was ever confiscated and whether any one from the Government

11     ever tested the gun.  But let's move on from there.  That

12     was a long time ago.  Personally 17 years ago; is that

13     correct?

14          THE DEFENDANT:  No, sir, Your Honor.

15          THE COURT:  It's longer than 17?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  You said that you have been incarcerated

18     almost two decades; is that correct?

19          THE DEFENDANT:  Yes, sir.  Yes, sir, Your Honor.

20          THE COURT:  That will make it 20 years?

21          THE DEFENDANT:  Yes, sir, Your Honor.

22          THE COURT:  So then you been there longer than

23     17 years?

24          THE DEFENDANT:  Yes, sir, Your Honor.

25          THE COURT:  So what was the date you were initially

1    confined?

2         THE DEFENDANT:  April 3rd, 2023 -- 2003, Your Honor.

3         THE COURT:  2003?

4         THE DEFENDANT:  Yes, sir, Your Honor.

5         THE COURT:  Okay.  Now, I turn to the prosecution.  I

6    gave Mr. Hardy an opportunity to state any materials he

7    wanted to state over and beyond what his lawyer said, and

8    let me hear from you.

9         MS. PURDIE:  Yes, Your Honor.  Can you hear me?

10        THE COURT:  I can.

11        MS. PURDIE:  Okay.  First of all, I'd like to address

12   the letter that was written by the defendant to Your Honor

13   back in December.

14        THE COURT:  Okay.

15        MS. PURDIE:  In that letter, he characterized the

16   Government as having made numerous successful attempts at

17   prolonging this hearing, and I take issue with that, because

18   I have done no such thing.  I am very interested in

19   resolving this matter once and for all.  I can't speak to

20   what took place before I inherited the case from the prior

21   AUSA who is no longer with the office, but I can address the

22   defendant's statement that the Government stated in December

23   that it was unavailable to attend or continue the hearing.

24   That is untrue.  We have made several attempts to reschedule

25   the hearing since it concluded, and I have provided my

 1      availability on all of those occasions.  And most recently,

 2      Ms. Barnes asked if the parties were available on

 3      January 10th to set this matter.  I simply stated that I was

 4      going to be South Carolina for training, and, I have been

 5      and remain available to continue the hearing, so I just

 6      wanted to rebut that criticism and mischaracterization that

 7      was made in that letter regarding the Government.

 8            Having said that, I do believe this can be resolved

 9      quickly.  It is the defendant's burden to demonstrate that

10      he is eligible for compassionate release.  The bottom line

11      is that the defendant has to demonstrate extraordinary and

12      compelling reasons for his release, and he has not done

13      that.

14            First of all, chronic conditions that can be managed in

15      prison are not a sufficient basis for compassionate release.

16      The hypertension is not considered extraordinary and

17      compelling.  It can be managed in prison.  He is 58 almost

18      59 years old.  His ailments are ordinary for his age.  His

19      medical records show noncompliance with other medical

20      treatment and regimen, such as him failing to take medicine

21      and follow dietary protocols.  And I understand there are

22      some issues with the diet in prison now that may impact

23      that.  Nevertheless, he has not demonstrated that these are

24      extraordinary and compelling reasons for release.

25            Furthermore, his efforts at rehabilitation are only

1    relevant if he can demonstrate those extraordinary and

2    compelling reasons, which, again, he has not shown.  His

3    active Heroism Award, while admirable, he has already been

4    awarded for that in accordance with BOP policy.  It was not

5    extraordinary.  There is nothing extraordinary and

6    compelling about that alone.

7         And regarding COVID, as of today, there are no positive

8    inmates and no positive staff members at FCI Allenwood

9    Medium Facility.  There have been no death and no -- that's

10   no inmate deaths and no staff deaths at the facility, so his

11   risk of exposure to COVID appears to be minimum.

12        I would direct the Court to the *Thompson* and -- let's

13   see -- what was it, *Thompson* and *Dupre* cases, I believe.  I

14   submitted those to this Court via email back on

15   November 14th.  And *Thompson* is a Fifth Circuit decision,

16   and it says that the courts that granted compassionate

17   release on the basis of medical reasons have done so largely

18   for defendants who have already served the lion share of

19   their sentences and presented multiple severe health

20   concerns.  Some of those concerns cited in the footnote are

21   -- and it cites those cases where those defendants were

22   released on home incarceration, or their sentences were

23   reduced.  One of them, an inmate had served 17 years and

24   only had a year and a half left to go, and he was suffering

25   from diabetes, hypertension, and liver abnormalities.

1    Another one, the defendant had served over 80 percent

2    of his reduced sentence and suffered from end-stage renal

3    disease, diabetes, and hypertension.

4    So, Your Honor, the extraordinary and compelling

5    circumstances have not been shown.  But even if they had

6    been shown, the Court has to then consider the 3553(a)

7    factors.

8    And in this case, the nature and circumstances of the

9    offense and the history and characteristics of the

10   defendant, which is one of the first factors the Court has

11   to consider, the defendant committed a bank robbery, which

12   as you know, is a crime of violence.  He brandished a

13   firearm and pointed it at the teller.  This was not his

14   first offense.  He was career offender and was on supervised

15   release at the time he committed this offense.  His crimes

16   date all the way back to 1984.  He had four parole

17   violations over a nine-year period.  One of those crimes was

18   assaulting a Texas State Trooper.  His criminal history

19   category was VI at the time of sentencing.  And while I

20   agree with the defendant that the history and

21   characteristics of the defendant do not stop at the time of

22   sentencing, you have to look at all of the history and

23   characteristics of the defendant.  I don't believe his

24   current circumstances outweigh that past conduct, Your

25   Honor.

1      The second factor is the need for the sentence imposed

2    to reflect the seriousness of the offense, to promote

3    respect for the law, to provide just punishment for the

4    offense, to afford adequate deterrence to criminal conduct,

5    protect the public from further crimes, and provide the

6    defendant with needed educational or vocational training, et

7    cetera.

8      To allow release at this time, absent compelling

9    circumstances would depreciate the seriousness of this

10    offense.  The guideline range in this case was 360 months to

11    life.  The Court sentenced the defendant on the low-end of

12    the guideline range at 384 months, and to reduce that

13    sentence when much time is still left to serve, would

14    depreciate the seriousness of those crimes.

15      The defendant has not demonstrated that the 3553(a)

16    factors warrant release, so his motion should be denied.

17    And that's all I have, Your Honor.

18      THE COURT:  All right.  Let me go back to the

19    defendant, and touch on a matter that has not been touched

20    on, at least with him.  The defense counsel mentioned that

21    this defendant has some concerns about the Tuskegee

22    Experiment.  And the prosecutor mentioned that this

23    defendant has not been taking his medications.  Is that what

24    you said, Ms. Purdie?

25      MS. PURDIE:  Yes, Your Honor.  If I recall, there were

1    some indication in the medical record that he had been

2    reminded by medical staff to take his medications, and they

3    had strongly urged him to take both the flu and COVID

4    vaccines, which he did not take, which is his right not to

5    take those.  He is not obligated to take those, but I do

6    think it is inconsistent for him to claim fear of risk of

7    contracting the virus while, you know, also refusing the

8    treatment that would drastically reduce that risk.  I also

9    understand his concern regarding the Tuskegee incident as it

10   relates to vaccinations.

11       THE COURT:  I'll let either the defense counsel or

12   Mr. Hardy respond if either or both wish to do so.

13       MS. ABBY:  To respond in particular with the refusal of

14   the vaccine and medicine?

15       THE COURT:  Is he refusing?

16       MS. ABBY:  I will let Mr. Hardy speak to that.

17       THE COURT:  Mr. Hardy?

18       THE DEFENDANT:  Thank you.  Thank you, Your Honor.  As

19   we demonstrated to the Court at the very last hearing, based

20   on the Tuskegee University syphilis study that my mom -- as

21   I told you last time, we lost a relative, Melvin, due to the

22   fact that he got caught up in the Tuskegee Experiment.  And

23   so from that point, my mom, she didn't have the faith in us

24   taking vaccinations for basically anything for the most

25   part.  That was one of the reasons why she didn't take us to

1    the doctor and kinda sort of why I don't take the flu shot

2    and all of these other vaccines, because I -- for one

3    reason, I promised her that I would never do it, because I

4    could see the hurt and anxiety in her face when she

5    described the circumstances with Uncle Melvin.  And so I

6    promised her that I wouldn't end up in the same way, and I

7    been trying to keep my promise to her, you know, because --

8         In addition to that, you know, just yesterday I saw a

9    little girl, 18 years old, took the COVID vaccination, and

10   now she is -- she don't even know where she is at.  She is

11   dis-minded.  She is just laying there.  And so I almost

12   cried when I saw it, and I was, like, wow, why -- why didn't

13   somebody know that?  Why didn't somebody know and do

14   something about that?  And it kind of hurt me, you know,

15   because I know she was a little girl about 18 years old.  So

16   I was, like, wow.

17        You know, it actually began when Colin Powell died.  I

18   begin to get skepticism about it, right?  You know, me

19   wanting to do it and me thinking about my mom, it was just

20   so much going back and forth, back and forth.  And then when

21   I got COVID I said, well, Lord if it's time for me to die,

22   then it so be.  And with that situation, I'm a little

23   skeptical with that.

24        THE COURT:  Okay.

25        THE DEFENDANT:  I can no longer do it.

1        THE COURT:  Okay.  And then on the polio shot that I

2   asked your lawyer about, did you ever take that?

3        THE DEFENDANT:  No, sir.

4        THE COURT:  Okay.  And flu shots, you said you don't

5   take flu shots?

6        THE DEFENDANT:  No, sir.

7        THE COURT:  All right.  Anything else you want to add?

8        THE DEFENDANT:  Me?

9        THE COURT:  Yes.

10        THE DEFENDANT:  Your Honor, I would just like to say

11   that what happened 20 years ago, I know the Court can't

12   undue what happened.  But as I told you earlier, I filed my

13   motion under the First Step Act, compassionate release,

14   because it gave me an opportunity to present to the Court

15   the person that I am today.  That I have changed -- you

16   know, the person that I have changed to be today.

17        I didn't just start my rehabilitation to make a change

18   when the First Step Act came into play in 2018.  The very

19   day that you sentenced me and I made it to the Bureau of

20   Prisons, I went straight to the counselor, and I asked the

21   counselor, I said, I need some help to challenge my drug

22   addiction.  And as you can see in my report, she put me in

23   the program, and I took the program, because I know -- I

24   knew that I wanted to change my life, and that program

25   helped me a lot.  I mean, a lot.  It changed my life.

1          So when that occurred and then I went on and I saved

2    Lieutenant Kanem's life, and I was, like, I can save

3    somebody life.  I can do something different.  And that's

4    been my attitude over the 20 years that I have been

5    incarcerated.

6          It's very rare that you will see an individual in the

7    Bureau of Prison with no single incident report, because

8    this is the world that a lot of you might not know, and it's

9    not easy in this world, the Bureau of Prisons world.  So to

10   not to have an incident report, you have got to do some

11   strange things to stay away from all sorts of incidents,

12   because they are going to come at you.  You don't have to go

13   to them.  They will come at you.  So I bent over backwards

14   for the last 20 years to make sure that I can be a guide for

15   the next man or a mentor for the next man.  That's my

16   strategy to help someone help themselves.  I begin this,

17   like I said, way before 2018, because I know that the person

18   that I wanted to be for my kids.  And this is not the 20

19   years that I am locked in.  It will be for the next 20 years

20   when I am out in society to do the same thing.

21         It's a different task to get away from the person that

22   who you are.  And regardless of whatever the Court decision

23   might be, my intent -- I would not sway away from the path

24   that I am on, and that's the path of rehabilitation, because

25   that is what the Federal Bureau of Prisons is here for, to

1    change a person from who he was to show him a way that he

2    can become, someone who he want to be.  And that's my whole

3    -- that's been my action from back in 2003 when I went and

4    signed up with my counselor to take the RDAP Program to make

5    sure that I changed my life.

6        And, again, that's why I say you won't find an

7    individual hardly in the Bureau of Prison not with one --

8    not with any single incident report, because it takes

9    something to avoid that.  And so that's been what I have

10   been doing for the last 20 years, and that's what I am

11   continuing -- plan to continue to do, because I know now

12   that I can help somebody rather than hurt somebody.

13       You know, back in the day, I did not know that I could

14   really help somebody, because I saw myself as a person who

15   just out in the street.  You mentioned about the bank

16   robbery that a guy was to shoot out with the officer, as I

17   demonstrated and told the Court, that I don't know much

18   about weapons.  So I'm the type of guy that if I had saw a

19   security guard, he would have to catch me, because I would

20   be running as fast as fast can go.  The minute I saw a

21   security guard, I would be gone.  That's the type of person

22   I am.  I don't want no conflict with any security officer.

23   You know, so just trying to explain to the Court the person

24   that I am today and that's why I ask the Court to not to

25   view me as the person I was at sentencing, but the person

1    that stands before the Court today.

2        Throughout the Bureau of Prison, all the executive

3    staff, counselors, they call for me, because they know that

4    I am a reliable person.  And they trust me, because they

5    know that I am going to get the job done, that I am going do

6    whatever it takes to -- to make sure everything is going in

7    the right direction.

8        And again, like I say, that's what I do.  That's what I

9    continue to do.  And I hope that the Court see my motion as

10   a motion filed under the First Step Act and the changes that

11   Senator Cory Booker, Senator Durbin, Senator Grassley, tried

12   to bring forth for people like me.

13       Thank you, Your Honor.

14       THE COURT:  Did you talk to the warden about your

15   interest in being released under COVID?

16       THE DEFENDANT:  No.  I didn't talk to the warden

17   personally, because they -- it's been a -- they been -- the

18   warden here today is not here tomorrow, so what we have got

19   -- what they did send me back, right, they denied the motion

20   because -- not because of nothing really under the First

21   Step Act, because at the Bureau of Prison, they wasn't

22   allowed to give guys here at a meeting facility the release,

23   because they specifically told us, you can file to the

24   Court, and we prefer you to file to the Court, because the

25   Court got authority to give you the release that you

1    deserve.

2        THE COURT:  Now, on this hero -- go ahead and finish

3    your statement.  What were you about to say?

4        THE DEFENDANT:  Yeah.  Any of the staff here, you know,

5    at your request, you can speak with any of them, and they

6    will tell you exactly what I just explained to the Court.

7        THE COURT:  Do you have any title there at the

8    penitentiary?

9        THE DEFENDANT:  Well, right now I am just considered

10   the number one orderly.

11       THE COURT:  The number one what?

12       THE DEFENDANT:  Orderly.  A and O clerk orderly.

13       THE COURT:  Orderly?

14       THE DEFENDANT:  Yes, sir.

15       THE COURT:  And is that some kind of description that

16   the penitentiary provides?

17       THE DEFENDANT:  Yes, sir.  It's a -- it's a trusted

18   position where the -- everyone can't get it.  Everyone can't

19   get it.

20       THE COURT:  What do you have to do to get it?

21       THE DEFENDANT:  Well, you have to show the counselor

22   that you are willing to abide by all of the rules and

23   regulations and set an example for other inmates as to what

24   they are supposed to do in order to try to keep a lot of

25   chaos from going amongst prisoners and someone getting hurt.

1        My counselor, Mr. J. Newcomer, he sent you a --

2             THE COURT:  What's your counselor's name?

3             THE DEFENDANT:  Joshua Newcomer.

4             THE COURT:  Newcomer?

5             THE DEFENDANT:  Yes, sir.

6             THE COURT:  Okay.  And what does he say?

7             THE DEFENDANT:  He sent you a character letter

8    explaining my job detail, basically that he needs a person

9    of trust that -- to be in this position.  And that he

10   explained, I think, on the letter about how I coordinate all

11   of the programs in the unit, and that he believes -- if the

12   Court would ask him, he believes that I should be given

13   release, because he knows how I will work in the community.

14            THE COURT:  Okay.  Now, I want to ask you one last

15   question about the Heroism Award.

16            THE DEFENDANT:  Yes, sir.

17            THE COURT:  We have gone over the details of it.  But

18   were you ever publicly honored for that award there at the

19   penitentiary?

20            THE DEFENDANT:  Publically --

21            THE COURT:  Did they do a public ceremony there at the

22   penitentiary for you?

23            THE DEFENDANT:  No.  What occurred -- I don't know if

24   it's --

25            THE COURT:  I know they sent you a letter.  I know they

1    sent you a letter, and I know they also made a monetary

2    contribution to you.  But did they actually provide a

3    tribute to you in front of the other prisoners?

4        THE DEFENDANT:  No, sir.  If I may, I'll explain

5    exactly what occurred.

6        THE COURT:  Okay.

7        THE DEFENDANT:  I just happened to be at work and --

8        THE COURT:  I know what happened.  Now, I know what

9    happened.

10        THE DEFENDANT:  Yeah.  That's not --

11        THE COURT:  But what I'm asking you is, after that, did

12    they have any ceremony where they publicly acknowledged what

13    you had done?

14        THE DEFENDANT:  The warden, the captain, and I think it

15    was the case manager coordinator, they all met in my

16    supervisor's office, and the supervisor called me up, and

17    they say that someone wants to see you.  And I said huh?  He

18    said yes, we got someone who want to see you.  Come

19    upstairs.  So the warden and the what's it called gave me

20    that award, and I shook all of them hands and that was the

21    subject of that particular service.

22        THE COURT:  Last question for you.  Last quick

23    question.

24        THE DEFENDANT:  Yes sir.

25        THE COURT:  Did any inmates at the institution -- did

```
 1    any inmates at the -- tell the guards that I am talking, and

 2    tell them my court reporter can't hear with them talking.

 3    Who are you talking to?

 4        THE DEFENDANT:  That's one of the union managers, Your

 5    Honor.

 6        THE COURT:  What's his name, please?

 7        THE DEFENDANT:  Mr. Arnold.

 8        THE COURT:  Okay.  Just tell him I need to finish up my

 9    question.

10        All right.  Now, back to you right quick.  Did any

11    inmates show any anger towards you?

12        THE DEFENDANT:  Yeah.  They was -- somewhat.  Some of

13    them didn't like the -- they didn't like the action that I

14    took.  They didn't like the action that I took.  And I was

15    -- they was kind of skeptical for a minute, and I didn't

16    really know what was going to happen, Your Honor.  I stuck

17    to what I was, the person that I was.  I said that was the

18    right thing to do, and I went with it.

19        THE COURT:  Did anybody threaten you?

20        THE DEFENDANT:  Yeah.  They was sending semi-threats,

21    like, you helping the police and --

22        THE COURT:  Was any of this in writing?

23        THE DEFENDANT:  No, sir.

24        THE COURT:  Just what they said to you?

25        THE DEFENDANT:  Yes, sir.
```

1          THE COURT:  Okay.

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  All right.  Thank you very much.

4     Now, I am going to render a written opinion by -- let

5     me see -- today is Monday, by next Monday, and I'll have an

6     opinion out on this.

7          Anything else, Ms. Abby?

8          MS. ABBY:  Just that we stand by our arguments made

9     beforehand and that we agree that -- we disagree with

10    (background conversations) that Mr. Hardy has (background

11    conversations) manage his (background conversations) when

12    coping with COVID.

13         THE COURT:  Okay.

14         MS. ABBY:  Other than that, Your Honor, that's all.

15         THE COURT:  Okay.  You are standing by what you stated

16    earlier?

17         MS. ABBY:  Yes, Your Honor.

18         THE COURT:  Okay, then.  Anything else from the

19    prosecution?

20         MS. PURDIE:  Your Honor, I, again, would just say, you

21    know, while I do applaud and find the defendant's actions

22    admirable -- (background conversations) awards and

23    combinations, rehabilitation, are admirable, and I applaud

24    that, he is not asking you to consider only the person that

25    he is now and not who he was before, he is asking you to

1    ignore the law.  You have to consider the nature and

2    circumstances of the offense and the history and

3    characteristics of the defendant.

4        And before you can even get to that point, you have to

5    determine there are extraordinary and compelling reasons.

6    And I don't think that either of those things can be done in

7    this case.

8        THE COURT:  All right.  Thank you very much.

9        All right.  All of you, thank you.  I will have the

10   opinion out before next Monday.  All right.  We are signing

11   off.  Thank you now.

12       MS. PURDIE:  Thank you.

13       THE DEFENDANT:  Thank you very much, Your Honor.

14   ****************************************************************

15

16

17

18

19

20

21

22

23

24

25

1      **COURT REPORTER'S CERTIFICATE**

2

3    I, Caroline Morgan, Official Court Reporter for the

4 United States District Court for the Southern District of

5 Mississippi, do hereby certify that the above and foregoing

6 pages contain a full, true, and correct transcript of the

7 proceedings had in the forenamed case at the time and place

8 indicated, which proceedings were stenographically reported by

9 me to the best of my skill and ability.

10    I further certify that the transcript fees and format

11 comply with those prescribed by the Court and Judicial

12 Conference of the United States.

13    THIS, the 12th day of May, 2023.

14

15        /s/ Caroline Morgan, CCR

16        Caroline Morgan CCR #1957
         Official Court Reporter
17        United States District Court
         Caroline_Morgan@mssd.uscourts.gov

18

19

20

21

22

23

24

25